# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                  Criminal No: 19-20080

v.                                      Hon. Judith E. Levy

WAYMON DAMON COSTNER,

       Defendant

_____/

### United States' Response Opposing the Defendant's
### Motion for Compassionate Release (ECF No. 23)

Waymon Damon Costner pled guilty to possession with intent to distribute fentanyl. Only a few months after being discharged from probation for a home invasion conviction, Costner had 119.2 grams of a substance containing fentanyl, one of the deadliest controlled substances. He admitted that he intended to distribute the fentanyl. This Court sentenced Costner to the mandatory minimum sentence of 60 months' imprisonment, and he began serving his current sentence on January 6, 2020. Costner now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

The government agrees that Costner's circumstances—including his heightened risk for severe complications from Covid-19 based on his obesity—qualify as "extraordinary and compelling reasons" for release. But the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—do not support release. The nature and circumstances of Costner's offense are serious. Costner's history includes a home invasion conviction for which the offense conduct involved Costner strangling and repeatedly punching the mother of his children. Additionally, releasing Costner after only completing 23 percent of his sentence would undermine the need for his sentence to reflect the basic aims of sentencing.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Costner, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). The Bureau of Prisons has also received 67,210 doses of the Covid-19 vaccine as of March 3, 2021 and is distributing the vaccine to its staff and inmates as quickly as it is received by each institution. *See*

CDC Covid-19 Vaccine Tracker and BOP COVID-19 Vaccination Implementation. The Bureau of Prisons also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of February 2021, this process has already resulted in the BOP releasing at least 138 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Costner's motion for compassionate release.

## Background

Waymon Damon Costner pled guilty to possession with intent to distribute fentanyl. On June 8, 2018, Waymon Damon Costner sustained injuries during a traffic accident in Detroit requiring transport to the Detroit Receiving Hospital for treatment. Upon arrival, a nurse conducted an inventory search and retrieved $1,659.76 in wads of cash and a sandwich baggie containing an off-white powder,

later confirmed to be 119.2 grams of a mixture or substance containing fentanyl, from Costner's pockets.

Costner's history includes a home invasion conviction for which the offense conduct involved Costner strangling and repeatedly punching the mother of his children.

This Court sentenced Costner to 60 months' imprisonment. He began serving his prison sentence on January 6, 2020 and is currently incarcerated at Elkton FCI. He is 30 years old, and his projected release date is April 6, 2024. His only underlying medical condition is obesity. Costner has moved for compassionate release, citing his obesity and the Covid-19 pandemic. Costner properly exhausted his request for compassionate release.

## Argument

**I. The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.**

**A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has

maintained a [detailed protocol](#) for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* [BOP Covid-19 Modified Operations Website](#). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued

5

face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* [BOP Modified Operations](#). But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* [BOP Modified Operations](#).

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

6

## B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 7,544 inmates on home

7

confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 22,302. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1) Each inmate's age and vulnerability to Covid-19;
>
> 2) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

8

The Bureau of Prisons must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? It is important to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not

9

place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

### C. The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.

As of March 3, 2021, the Bureau of Prisons has acquired 67,210 doses of the Covid-19 vaccine and is distributing it to staff and inmates. *See* [CDC Covid-19 Vaccine Tracker](#) and [BOP COVID-19 Vaccination Implementation.](#) The Bureau of Prisons has already administered 61,798 doses of the Covid-19 vaccine to staff members and inmates. *See id.* While the precise timing of each inmate's vaccination will depend on many factors, the Bureau of Prisons is working swiftly to vaccinate inmates who consent to receive the vaccine. While Costner has not yet been offered the Covid-19 vaccine, Elkton FCI has already completed 175 staff inoculations and 21 inmate inoculations to date. *See* [BOP COVID-19 Vaccination Implementation.](#)

## II. The Court should deny Costner's motion for compassionate release.

Costner's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529

F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). Those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction" when a defendant requests compassionate release. *United States v. Sherwood*, 2021 WL \_\_\_\_, at \*\_\_\_\_ (6th Cir. Feb. 2, 2021).

### A. Costner has not shown "extraordinary and compelling reasons" for compassionate release.

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Elias*, ___ F.3d ___, No. 20-3654, 2021 WL 50169, at *2 (6th Cir. Jan. 6, 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, 2021 WL 50169, at *2, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. The government disagrees with that holding and preserves for further review its argument that § 1B1.13 remains binding. But, given the Sixth Circuit's holding in *Elias*, controlling circuit precedent now forecloses that argument before this Court.

The government agrees that Costner's circumstances qualify as "extraordinary and compelling reasons." Costner's medical records establish that, at 73 inches tall and 288 pounds, he is obese with a body mass index of 38. (Exhibit A: Bureau of Prisons Records, (*filed under*

13

*seal*), p. COSTNER_BOP_0090). Obesity is a medical condition which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with obesity, Costner has satisfied the initial eligibility criteria for release under § 3582(c)(1)(A).

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same).

14

This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction". *United States v. Sherwood*, 2021 WL \_\_\_\_, at \* \_\_\_\_(6th Cir. Feb. 2, 2021). The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Here, even if Costner has established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Costner's significant remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote

15

respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Releasing Costner now, after only completing 23 percent of his sentence, and before completing a drug treatment program as recommended by this Court (*see* Judgment, ECF No. 22, PageID.69), would undermine the need for Costner's sentence to reflect the basic aims of sentencing, including promoting respect for the law and providing just punishment for the offense, general and specific deterrence, and rehabilitation.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id*. So a defendant with several years left on his sentence, like Costner, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id*.

Additionally, the nature and circumstances of Costner's offense are serious. Costner was in possession of and intended to distribute 119.2

16

grams of a substance containing fentanyl, one of the deadliest controlled substances[1] contributing to the current opioid epidemic.[2] Fentanyl is not just dangerous to users; it can be absorbed through the skin or inhaled and is a threat to anyone in the community who is exposed to it. Costner put community members, including emergency medical personnel who treated him after his traffic accident, at great risk of serious harm.

Costner's history and characteristics also weigh against compassionate release. He has a substance abuse disorder, reporting that he was smoking marijuana daily. *See* Exhibit A at p. COSTNER_BOP_0012. And a review of BOP records indicates that Costner has not participated in any drug treatment program. Moreover, Costner has a history of violence. He has a 2015 conviction for home invasion – 3rd degree for which he was sentenced to three years' probation and 26 weeks of batterers counseling, and ordered to have no

---

[1] *See Fentanyl*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/opioids/fentanyl.html (last visited Mar. 3, 2021).
[2] *See Understanding the Epidemic*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/epidemic/index.html (last visited Mar. 3, 2021).

17

contact with the victim (the mother of his children). Pursuant to a plea agreement, charges for home invasion – 1st degree, assault with intent to do great bodily harm less than murder, and domestic violence were dismissed. This offense involved Costner strangling his victim and punching her repeatedly in their children's bedroom. The victim told officers that she feared for her life because Costner had assaulted her in the past. The presentence report indicates that probation records were unavailable, but a show cause hearing tool place on June 27, 2017, at which time Costner's term of probation was continued and extended to April 6, 2018. On March 7, 2018, his term of probation was closed. (PSR ¶ 31). Only a few months later, Costner was possessing with intent to distribute fentanyl in the case below.

Consideration of the § 3553(a) factors weighs against granting Costner's motion for compassionate release.

### III. If the Court were to grant Costner's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Costner's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Costner's motion should be denied.

                                            Respectfully Submitted,

                                            SAIMA S. MOHSIN
                                            Acting United States Attorney

                                            s/ *Lisandra Fernandez-Silber*
                                            Lisandra Fernandez-Silber
                                            Assistant U.S. Attorney
                                            211 West Fort Street, Suite 2001
                                            Detroit, Michigan 48226-3211
                                            (313) 226-9122
                                            lisandra.fernandez-silber@usdoj.gov

March 3, 2021


# **CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

I further certify that on March 3, 2021, I filed Exhibit A to the Government's Response *under seal* with the Clerk of the Court.

I further certify that the pro se litigant in this case cannot be served by the Court's ECF system and would traditionally be served by mail. Travel restrictions imposed by the partial closure of our office due to the Covid-19 pandemic have limited the access of USAO personnel to printers and postage and the frequency of trips to a post office. As such, by March 10, 2021 at the latest, the government will mail this response to:

Waymon Damon Costner
Reg. # 57225-039
FCI Elkton
P.O. Box 10
Lisbon, OH 44432

s/ *Lisandra Fernandez-Silber*
Lisandra Fernandez-Silber
Assistant U.S. Attorney